1

```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division




------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :    Case No. 1:16-cr-289
                              :
                              :
ZACHARY L. SHAMES,            :
               Defendant.     :
                              :
------------------------------:




                        SENTENCING HEARING


                        January 26, 2018


             Before:   Liam O'Grady, USDC Judge
```

<u>APPEARANCES:</u>

Kellen S. Dwyer and Catherine Alden Pelker,
Counsel for the United States

Thomas C. Hill, Kevin J. Quilty and Fabio Leonardi,
Counsel for the Defendant

The Defendant, Zachary L. Shames, in person

2

1          THE CLERK:  The Court calls case 1:16-cr-289, the

2    United States of America versus Zachary Shames for sentencing.

3          May I have the appearance, please, first for the

4    Government.

5          MR. DWYER:  Good morning, Your Honor.  Kellen Dwyer

6    for the United States.  And with me is Alden Pelker from CCIP,

7    she will be replacing Ryan Dickey, at least for the meantime on

8    both this case as well as the cases against Taylor Huddleston,

9    Ruslans Bondars and Jurijs Martisevs.

10          THE COURT:  All right, good morning.  Good morning to

11    you both.

12          MS. PELKER:  Good morning, Your Honor.

13          MR. HILL:  Good morning, Your Honor.  Thomas Hill,

14    and my colleagues Fabio Leonardi and Kevin Quilty on behalf of

15    Zachary Shames, who is present as well.

16          THE COURT:  All right.  Good morning to each of you.

17    Good morning, Mr. Shames.

18          All right, this comes on for sentencing.  Are the

19    parties ready to proceed?

20          MR. DWYER:  Yes, Your Honor.

21          MR. HILL:  We are, Your Honor.

22          THE COURT:  All right, let's discuss first then the

23    enhancement of two levels for special skills that the Probation

24    Office determined was necessary under the Guideline

25    calculation.

1          Well, let me first ask, Mr. Hill, are there any other

2     objections to the presentence report other than the special

3     skill?

4          I understand that there is an objection generally to

5     paragraph 10 being included, which was the conduct of Mr.

6     Huddleston.  And what's the basis for that?

7          MR. HILL:  Excuse me, Your Honor, just one moment.

8          THE COURT:  Yes.

9          MR. HILL:  Your Honor, that would relate to -- and I

10    guess this is the other objection to the PSR.  The intent to

11    obtain personal information enhancement which the Probation

12    officer has included, but the Government isn't seeking and we

13    are not seeking, so if the Court were to accept the joint

14    positions of the parties here, then we don't have an objection.

15         THE COURT:  Okay.  I am accepting that.  I'm not

16    going to give the enhancement for the personal information, for

17    the intent to receive personal information.

18         So that --

19         MR. HILL:  So that leaves special skills, Your Honor.

20         THE COURT:  Okay.  Then why don't you go ahead with

21    special skills.

22         MR. HILL:  Certainly, Your Honor.

23         THE COURT:  Well, let me back up.  Are there other

24    objections to the presentence report, any of the information

25    generally in the report or other calculation errors that you

4

1   seek to --

2           MR. HILL:  No, Your Honor.

3           THE COURT:  Okay.  Mr. Shames, have you gone over the

4   presentence report, sir?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  Any other additions, corrections that you

7   want to make to the report at this time?

8           THE DEFENDANT:  No, Your Honor.

9           THE COURT:  All right, thank you.

10          All right, then go ahead.

11          MR. HILL:  Your Honor, I am going to rely principally

12  on the written materials that we've submitted.  I don't want to

13  belabor the points and unnecessarily take the Court's time.

14          But I would say, I mean, the special skill

15  enhancement, we have two principal reasons why I don't think it

16  applies.  First of all, as the commentary says, it should be

17  applied in circumstances that usually require substantial

18  education, training, or licensing.  And then gives as examples

19  pilots, lawyers, doctors, accountants, chemists, and demolition

20  experts.  We would suggest, respectfully, that none of those

21  apply in this particular case.

22          Your Honor, the overwhelming majority of the relevant

23  conduct, 82 percent, frankly, by calculation of the Government,

24  occurred when Mr. Shames was 16 and 17 years old when he was a

25  high school student when he had no formal training or education

5

1    related to computers.

2            The activities here are completely self-taught, if

3    you will, by going to Internet forums and Internet fora.  There

4    is no education.

5            I would suggest to the Court, if we were standing

6    here, as we are now, six years later and we were talking about

7    offenses that were committed today, which we're obviously not,

8    then I would be much less vigorous in my argument because he is

9    a computer science major now about to graduate with a computer

10   science degree.  And perhaps that qualifies as the substantial

11   education.

12           But certainly when he was 16 and 17 when the crux of

13   this case was developed, that was not the case.

14           THE COURT:  Well, he certainly has developed over

15   time.  He took great pains to develop his computer skills, I

16   agree with you, at 16 and 17 and also at 18, and was actively

17   pursuing his side business until the FBI knocked on his door.

18   And by that time, he had very legitimate, clear special skills,

19   right?

20           MR. HILL:  Well, Your Honor, I would -- two responses

21   to that.  First of all, as I said, the crux of this matter has

22   to do with his development and sale of this particular malware.

23           THE COURT:  Right.

24           MR. HILL:  Okay.  82 percent of those sales occurred

25   before his 18th birthday while he was in high school.

6

1          THE COURT:  Nobody is arguing that he should be held

2     culpable for those sales.  And I think that is totally

3     appropriate.

4          MR. HILL:  And I would suggest equally, he did not,

5     within the meaning of the enhancement, did not possess a

6     special skill as it related to those activities.

7          THE COURT:  At the time he began --

8          MR. HILL:  And frankly, Your Honor, if you look at

9     the timeline, by the time he entered college, the activities

10    that were related to this offense, the 18 percent, if you will,

11    okay, was really -- had really tapered off significantly until

12    they came to a stop.

13         So it seems inappropriate, Your Honor, to apply that.

14    I mean, in effect, it seems to me what you're saying is -- or

15    what one would be saying, not you, is that being smart or being

16    skilled, in and of itself means that the enhancement should

17    apply.  And I don't think that's what the enhancement is there

18    for.

19         Secondly, I would argue, Your Honor, that in order to

20    commit the offense of aiding and abetting computer intrusions

21    by developing -- the special skill, if you will, is built into

22    the offense itself.  You can't commit the offense without

23    having the special skill, however it is that you developed that

24    special skill.

25         THE COURT:  So what about the Government's arguments

7

1    that you could steal somebody's password and get into their

2    computer and --

3              MR. HILL:  Well, under that --

4              THE COURT:  -- and commit the offense?

5              MR. HILL:  There may be a theoretical way of

6    committing the offense in that way, but I think you have to

7    apply it to the facts of this case and to the allegations and

8    the circumstances of this case, which have nothing to do with

9    that, and have everything to do with his development of the

10   malware and done, completely self-taught, while he was in high

11   school.

12             So again, without belaboring the point, Your Honor,

13   we would argue that those two points should not apply.

14             THE COURT:  Okay.  Thank you.

15             Mr. Dwyer.

16             MR. DWYER:  Your Honor, first of all, the fact that

17   skills are self-taught is not and should not be a disqualifying

18   factor.  That's what the Ninth Circuit said in Petersen.  In

19   particular in the computer context, very frequently you have

20   self-taught people developing a lot of computer skills.

21             Secondly, in terms of the level of skill that went

22   into coding this malicious software, it was a lot.  And what

23   attests to that is that there were 3,000 people, 3,000 people

24   who knew something about computers who were on these hacking

25   forums, who believed that his skill as a software developer was

1  sufficient for them to want to spend money to buy his Keylogger

2  because presumably they did not have the skills to code it

3  themselves.  And that's why it's not theoretical, as opposing

4  counsel just said, that somebody could commit computer hacking

5  without having the skills.

6        Allowing unskilled people to commit hacking was the

7  point of this crime.  The point of him developing this

8  Keylogger and selling it is that he's taking something that

9  would be difficult to hack into a computer and allowing his

10 users to do it very easily.

11       Using his Keylogger to commit computer hacking was

12 not difficult in the same way that using a Web site like

13 Facebook to share a photo is not very difficult.  What's

14 difficult is being the person, the software engineer who codes

15 the photo sharing application.  And that's the skill that he

16 brought to bear.

17       And it is significant, he is not being punished for

18 being smart, but he is being punished for using those talents

19 to exponentially increase the number of people who can commit

20 these types of crimes.

21       THE COURT:  All right, thank you.

22       Well, I think that the special skill enhancement is

23 very appropriate here.  I understand the timing of when Mr.

24 Shames developed the skills, that they weren't developed as a

25 lawyer or a doctor, as referenced in the Guideline calculation,

1    during training for a good purpose and the case law that talks

2    about that.

3            But I agree with the Government that the <u>Petersen</u>

4    case out of the Ninth Circuit, and <u>O'Brien</u>, and even the <u>Godman</u>

5    case out of the Sixth Circuit, we're in a new consideration

6    when we're talking about the training necessary to carry out

7    the skills that Mr. Shames developed for the purpose that he

8    did in this criminal enterprise.

9            He may have developed them when he was a juvenile,

10    but he continued to use them and to hone them -- I think the

11    e-mail exchanges that were part of the sentencing submissions

12    are so clear that Mr. Shames continued to work on his craft.

13    And that when purchasers had issues or they wanted assurances

14    that the malware would work against antivirus software that was

15    on the computers of those being hacked, he gave them those

16    assurances, and talked about it working on next generation

17    computers.  And I think that those clearly fit within the

18    special skill enhancement, and continued as he was an adult.

19            And so, I find as a result the Guideline range is

20    ultimately, after acceptance of responsibility, is a 25.  And a

21    Criminal History Category I.  And the resulting Guideline range

22    is 57 to 71 months.

23            I have considered the submissions of the Government,

24    their original sentencing position, and also their motion for a

25    downward departure.  I grant that motion and believe that Mr.

10

1    Shames is entitled to a reduction from any otherwise

2    appropriate sentence.

3            I have read the many submissions by defense counsel,

4    including the written submission and recommendation on

5    sentencing.  And I see that there are many people here on

6    behalf of Mr. Shames and as well as his family.

7            And I will hear whatever else the Government would

8    like to say at this time on sentencing.

9            MR. DWYER:  Just briefly, Your Honor.

10           The only point that I would like to respond to from

11   the defendant's sentencing memo is at the very end they have

12   cited a few cases of 1030 violations that resulted in

13   probation.

14           As you might imagine, that's not exactly a

15   representative sample of how courts have dealt with these types

16   of offenses.  Mr. Hogue, which was the case out of the Southern

17   District of New York, I looked into that case, he had a

18   co-defendant or a defendant in a separately numbered case who

19   was actually the primary developer of the malware in that case.

20   And that person was sentenced to 57 months.

21           And I have pointed the case out to defense counsel.

22   They certainly don't think the case is on all fours, and I

23   wouldn't suggest that it is, but certainly there is -- folks

24   who are the developers of malware are not typically sentenced

25   to probation.

11

1           Mr. Culbertson, which is the case out of

2    Pennsylvania, there is less information on, but the offense

3    level there was 13 and the Guidelines were 10 to 16 months.  So

4    it appears that it was not nearly as widely distributed of

5    malware as there was in this case.

6           And then Yelverton was not a malware developer.  He

7    was someone who -- someone who hacked into a few -- I guess 50

8    computers.  I shouldn't minimize it.  But was someone who was

9    actually doing hacking, which was certainly a very serious

10   crime, but when you're talking about malware developers, you're

11   talking about someone who is enabling these sorts of crimes to

12   occur again and again and again.

13          And that's why at least the Government sees them as

14   being in a different category.

15          Thank you.

16          THE COURT:  Thank you.  All right, counsel.

17          Did you have any witnesses that you wanted to call?

18          MR. HILL:  Not witnesses, Your Honor.  I do want to

19   acknowledge the presence, as the Court has already done, of

20   many people, including Mr. Shames' parents, his sister, his

21   girlfriend and their family, many, many people who have also

22   written to the Court.

23          THE COURT:  Go ahead, I merely --

24          MR. HILL:  No, I understand, Your Honor.  But I did

25   want to tell the Court that specifically with respect to his

12

1    current and future employer, ThreatQuotient, Mr. Kurtzman, the

2    CFO of ThreatQuotient, Mr. Couch, the senior vice-president of

3    strategy, and Mr. Colter, the director of technical alliances,

4    are here and are certainly available to answer questions for

5    the Court.  I mean, I think they have expressed their views in

6    the form of their letters.

7            I guess what I'm saying is I'm perfectly happy to

8    have them testify if the Court would think that it would be

9    helpful to the Court.

10           THE COURT:  Their positions were very clear, and I

11   read their letters carefully, and I don't have any questions

12   for them.  And I have no doubt that Mr. Shames is doing exactly

13   what they say he is doing for them and that he will be an

14   excellent employee moving forward.

15           So I don't think there is a need to call them.

16           MR. HILL:  Okay.  In that event, Your Honor, no

17   witnesses.

18           THE COURT:  Okay.  Then please go ahead.

19           MR. HILL:  Would you like me to proceed, Your Honor?

20           THE COURT:  Yes, sir.

21           MR. HILL:  Okay.  And again, I know we've given you a

22   lot to read, and we really appreciate the Court's consideration

23   of all those materials.  I will try to be brief and try not to

24   duplicate what I have already done in the written --

25           THE COURT:  You take the time you believe is

13

1   necessary.  It's an important matter.

2            MR. HILL:  Yes, Your Honor.  Thank you.  I really

3   appreciate it.

4            Let me begin, Your Honor, by saying, in all

5   sincerity, in the 42 years that I have been doing this work,

6   first as an Assistant United States Attorney and as a defense

7   counsel, I have never seen a defendant who has been so

8   committed to making amends and trying to turn a bad situation

9   into a positive.  He has been completely honest with me, with

10  the Court, with the Government, with his family, with his

11  employer, and most importantly perhaps with himself.

12           And I have never been more certain as I am with Zach

13  that he has and will continue to turn this unfortunate

14  experience into a positive one for himself and for the

15  community.

16           Let me turn to the two Guideline bases at least for

17  departure from the Guidelines.  The Court has already

18  acknowledged the Government's motion under 5K.  Your Honor,

19  that substantial assistance to the Government began really from

20  day one.  It began when Zach completely confessed to the FBI.

21           I would also tell the Court, this is not one of those

22  situations that I think we've all been in and that happens all

23  too frequently where eventually the truth comes out, but it

24  takes -- it's quite a process for the truth to come out.

25           That wasn't the case here.  Zach has been completely

14

1   and totally honest from day one.  He has met with the

2   Government on a number of occasions, lengthy sessions.

3   Provided the Government all the -- answered all their

4   questions, provided whatever information he had.

5         He has testified in front of the grand jury.  His

6   cooperation, Your Honor, has contributed to certainly the --

7   has contributed to Mr. Huddleston's indictment and subsequent

8   plea, I would suggest.  Has contributed to the arrest,

9   extradition, and indictment of Mr. Bondars and Martisevs.  I

10  apologize if I mispronounced that.

11        And Mr. Shames is committed, if called upon by the

12  Government, to testify if there is a trial in either or both of

13  those matters.  Or for that matter, any other matters that may

14  come down in the future of which we are not aware currently.

15        The Government has indicated to the Court that Mr.

16  Shames' cooperation has been helpful to them in at least two

17  legally significant ways.  It has helped establish venue in

18  this court in all the matters that I have just mentioned.  And

19  he has been able to describe and will be able to describe how

20  these other defendants' products assisted the development and

21  distribution of malware.

22        I think there is absolutely no question that his

23  cooperation has been substantial, and important, and

24  continuing.  And, Your Honor, it will continue as long as it is

25  called upon.

15

1              Let me turn briefly to other bases for the downward

2     departure.  And under 5H1.1, as the Court is aware, age,

3     including youth, may be relevant in determining whether a

4     departure is warranted.

5              The Government itself in its sentencing memorandum

6     has recognized the applicability of 5H1.1.  And I quote:  The

7     Government does agree that the defendant's age is also a factor

8     that should be considered, and that the Court's consideration

9     of Sentencing Guideline 5H1.1 is warranted.

10             And the Probation Department acknowledges that as

11    well.

12             Mr. Shames was born on August 19, 1995.  The criminal

13    conduct at issue here occurred -- began six years ago,

14    virtually to the day.  I would ask the Court to look at Mr.

15    Shames and imagine this young man who is here today six years

16    younger and understand that the actions of a 16-year old and a

17    17-year old are not the actions of a mature adult.  They are

18    not well thought out.  The consequences of your actions are not

19    fully appreciated, and probably especially true of young men.

20             So I would suggest to the Court that a downward

21    departure based on 5H1.1 is very appropriate in this case.

22    82 percent of the conduct here occurred -- or the relevant

23    conduct occurred while he was a juvenile.  Unfortunately, it

24    continued for a period of time, not a lengthy period of time,

25    and it was tapering off, but it continued beyond his 18th

16

1   birthday.

2           Frankly, had it ceased before his 18th birthday, we

3   wouldn't be here.  As the Government acknowledges, the

4   Department of Justice policy is not to prosecute juveniles.  We

5   would be in Juvenile Court in a state court in Virginia.

6           So, Your Honor, I believe that a downward departure

7   under 5H1.1 as well as a downward departure under 5K are both

8   appropriate.

9           And in analyzing what the sentence should be, taking

10  into account both of those departures, I would suggest that you

11  have to consider that or you should consider that in the

12  context of his overall -- the overall characteristics.  He is,

13  as the Court recognizes I think from the letters that it

14  received, he is a kind young man.  A bright young man.  A

15  generous young man.  An upstanding friend, family member.

16  People rave about him.  And I think, frankly, were all shocked

17  when they learned about this.

18          But I think it is also important to understand that

19  he has been completely up front with all of those people about

20  what happened and maybe why it happened.  And he has been

21  completely honest, again.  And I think the honesty goes a long

22  way towards suggesting to the Court that this is someone who

23  truly has learned from his past indiscretions.

24          As I said before, he immediately confessed.  He has

25  been honest all the way through.  He has been honest with the

17

1   FBI.  He has honest with the U.S. Attorney's Office.  He has

2   been honest with his family.  With me.  He has been honest with

3   his employer.  He has been honest with his university.  His

4   cooperation is continuing.

5           Your Honor, his university, James Madison, told him

6   he needed to take a semester off when this became public.  So

7   what did he do?  He enrolled himself in Northern Virginia

8   Community College to take courses.  He found a job, which we'll

9   talk about in a second.  And now he is back in school for his

10  final semester, due to graduate in May with a degree in

11  computer science.  He has made the Dean's List while all this

12  is going on.  His academics have actually improved, again in an

13  effort -- his effort to make amends and to turn his life

14  around.

15          He is committed to doing community service, and has

16  done so voluntarily.  He likes working with children and has

17  been working with children.  You have the letter in front of

18  you from Second Home, which demonstrates the community service

19  he has been engaged in.

20          And finally, Your Honor.  He had the good luck of

21  having an opportunity to try to get a job at ThreatQuotient,

22  the good guys.  The people who -- the company that prevents the

23  kinds of activities that he was engaged in when he was 16 and

24  17 years old.

25          The Court has seen the letters, and I just want to

18

1   reference a few things from the letters.  Mr. Kurtzman, the CFO

2   writes:  I can unequivocally state that Zach Shames has been

3   the best intern that I have ever worked with.  He is smart.  He

4   is creative.  He was an extremely hard worker.  Zach and I

5   talked about his past actions, and I truly believe that Zach is

6   extremely remorseful for his past behaviors.  He was put under

7   the spotlight at ThreatQuotient as well because we all knew of

8   his background, yet he excelled.  We are enthusiastically

9   looking forward to the day that Zach can join our company as a

10  full-time employee after his graduation in May 2018.

11          Mr. Couch, his immediate supervisor and, frankly, the

12  person who was most probably, along with Mr. Kurtzman, most

13  responsible for hiring him, both of whom put their own

14  credibility on the line with the CEO who, frankly, was

15  ambivalent about whether or not this was an appropriate hire or

16  not, they both put their credibility on the line and said, we

17  think this is the right thing to do, we have interviewed him,

18  we have spoken with him.  And that's exactly -- and Zach has

19  rewarded their confidence in him.

20          Mr. Couch, who has experiences in dealing with young

21  men who have had similar problems as Zach did in their younger

22  life, he says:  I found that the deciding factor for me on

23  whether or not to hire them was motivation.  Had they done it

24  for strictly financial purposes to inflict harm upon others?

25  Or were they just curious and creative with no positive

19

1  outlook?  I met a very smart kid who was very curious and

2  creative with computer technology that took a wrong turn.

3  After working with Zach for about eight months now, I can

4  unequivocally say that he is one of the most talented and

5  stand-up young men I have ever met.  For what it is worth, I

6  have experience with bad people intending to do bad things, and

7  that isn't Zach.  He made a mistake and he is choosing to learn

8  from it.  Zach has a ton of talent that can be redirected to

9  positively influence the world he comes in contact with, and I

10  would hate to see him receive a sentence that would negatively

11  impact his ability to be successful and become a mentor for

12  others in the future.

13        And then finally, Mr. Colter, another one of his

14  supervisors:  I have no doubt that if given the opportunity,

15  Zach will continue to use his energy, commitment, and

16  dedication to do good in the community and make amends for his

17  past behavior.

18        Your Honor, I would submit to the Court that Zach is

19  really the model of how the criminal justice system should

20  expect and wants to expect offenders to respond to their

21  misdeeds.  He has a bright future.  He can and will be a huge

22  help in combatting exactly the kind of criminal behavior that

23  brings him before the Court.  It is hard for me to imagine a

24  more productive result of this unfortunate event.

25        Your Honor, with all due respect, we would submit

1    that his substantial assistance to the Government, his age, his

2    own rehabilitative efforts, all warrant a probationary sentence

3    with whatever conditions of probation the Court were to deem

4    appropriate.

5             Your Honor, just briefly, Mr. Dwyer made reference to

6    the three examples that we cited in our sentencing memorandum.

7    We certainly didn't intend them to be exhaustive.  We wanted

8    the Court to understand that other courts confronted with what

9    we believe is similar activity -- and, frankly, somewhat less

10   sympathetic activity given the fact that three that we cited

11   all were people where the entirety of the conduct occurred when

12   they were adults.  Okay.

13            Mr. Dwyer made reference to the case out of

14   Pennsylvania, the Carnegie Mellon student, Mr. Culbertson, and

15   made reference to the Sentencing Guidelines.  Well, fortunate

16   for Mr. Culbertson and unfortunate for Mr. Shames, the Western

17   District of Pennsylvania has a very different way of

18   calculating loss for purposes of these cases.  And that

19   explains, frankly, the Guideline calculation in that case.

20            And finally, Mr. Dwyer is right, last night he called

21   me and said he might mention the Yucel case to the Court, which

22   is the co-defendant to Mr. Hogue.

23            Your Honor, if anything, I would suggest that the

24   Yucel case is such a stark contrast to Mr. Shames' case that it

25   really shows why a probationary sentence for Mr. Shames is the

21

1  appropriate sentence.

2         Mr. Yucel was the developer of what is known as a

3  RAT.  Okay.  He was the head -- this comes from the

4  Government's papers.  He was the head of an international

5  criminal organization known as Black Shades.  He employed

6  several paid administrators, including a director of marketing,

7  a Web site developer, a customer service manager, and a team of

8  customer service representatives.  He hired and fired

9  employees.  He generated sales of more than $350,000.  And I

10 believe it was a half a million computers that were infected.

11 Okay.

12         He, Mr. Yucel, personally used his own software to

13 infect computers.  Zach certainly did not.  Mr. Yucel did not

14 cooperate and did not receive a 5K motion as Zach did.  The

15 Guideline range in Mr. Yucel's case was stipulated at 70 to

16 87 months by both the Government and the defense as part of the

17 plea agreement.

18         During sentencing the Government noted:  What strikes

19 me here is really the lack of mitigating circumstances in Mr.

20 Yucel's case.

21         I suggest that what should strike the Government here

22 and the Court here is the abundance of mitigating

23 circumstances.

24         And finally, with respect to Mr. Hogue, the

25 co-defendant who did get probation, the Government reflected

22

1    that he was the employee who extracted himself from the

2    organization for a significant amount of time, and yet Mr.

3    Hogue's involvement certainly in a criminal organization was

4    more significant, more substantial than Mr. Shames'.  And yet

5    Mr. Hogue was given the probationary sentence in the Southern

6    District of New York.

7          So I think it is a perfectly appropriate case to have

8    cited to the Court.  Okay.  And I would suggest that when the

9    Government pointed me to the Yucel case, that that actually by

10   way of contrast, is exactly -- shows exactly why probation is

11   the correct result here as opposed to in the Yucel case where

12   it clearly wasn't.

13         Your Honor, this is an appropriate and just sentence,

14   probation would be, under all the facts and circumstances here.

15   The young man before you today is simply not the same boy,

16   teenage boy who committed this offense.

17         Your Honor, if the Court sentences Mr. Shames to

18   probation, I can guarantee you the Court will not regret that

19   decision.

20         Thank you.

21         THE COURT:  Thank you, Mr. Hill.

22         Am I correct that there is no restitution that's

23   anticipated given the nature of the facts of this case, is that

24   right?

25         MR. HILL:  That's right.  There is a forfeiture

23

1    order, Your Honor, that does require financial payment, but

2    it's not a restitution order.

3            THE COURT:  Right, it's not restitution to victims.

4    Okay.  Thank you.

5            All right, Mr. Shames, please come to the podium.

6    This is your opportunity to tell me anything you would like to.

7    And please remain there when you're done.  I have read your

8    letter to the Court.

9            THE DEFENDANT:  Your Honor, I just want to begin to

10   apologize to you, the Court, the Government, and especially my

11   friends and family for putting myself in this situation and

12   everything that came with it.

13           I also wanted to say thank you to everyone who came

14   to support me.  I really appreciate it.

15           I don't have too much to say other than what you've

16   already read in my letter to you, but I am incredibly

17   remorseful for what I did.  I can't really say why I did it.

18   All I can think of is I was naive and I thought I was above

19   everyone.  But I am not, and I realize that now.  And I have

20   learned from that.

21           And I have taken the time to kind of reflect and

22   figure out how I can do more positive things in the future and

23   how I can make up for what I've done.

24           THE COURT:  So there is a suggestion in the papers

25   that you really didn't understand the gravity of what you were

24

1   doing.  I take it, you know, part of it was your age.  But, I

2   mean, you understood that this Keylogger system, this malware

3   system was going to be used to steal people's identity, and

4   bank accounts, and cause them great upheaval in their own

5   lives, right?

6             THE DEFENDANT:  Yes, Your Honor.

7             THE COURT:  All right.  So I have trouble -- I know

8   youth is -- believe me, I have personal experience with youth

9   and young men and their ability to really digest sometimes the

10  consequences of their actions.  But even when you were 18 and

11  you're getting these e-mails from hackers, you're being asked,

12  is my system going to work against this?  Is it going to work?

13  It was almost a pride of ownership and skill that came out of

14  those responses.

15            Tell me what was going on in your mind back then.

16            THE DEFENDANT:  I think that I more or less dug

17  myself into a hole, and what I cared about back then was my

18  reputation among the community that I basically surrounded

19  myself when I was 16 and 17.  And I think because of that, I

20  had to keep up the persona that I was putting out for being

21  that person and saying what I said in the e-mails.

22            THE COURT:  So what you were doing with the money?

23            THE DEFENDANT:  I put it away.  I am not a big

24  spender.  I didn't really do anything with it.

25            THE COURT:  So what was the high?  What was going on?

25

1    Why was this so exciting for you to do this?

2              THE DEFENDANT:  I think, like I mentioned earlier,

3    the, if you want to say, prestige or the recognition from the

4    community that I was involved in --

5              THE COURT:  The hacking community?

6              THE DEFENDANT:  Yeah.  That it was sort of an echo

7    chamber, and they appreciated it.  And it almost -- I guess

8    that was the high.  And the recognition was -- I guess I liked

9    getting it.

10             And if I -- looking back on it now, if I had some

11   sort of mentor or someone to guide me through what I learned

12   myself, I think it would have turned out much differently.  But

13   the people who I surrounded myself with were the same people

14   who were not doing good things.

15             THE COURT:  All right.  I interrupted you.  Are you

16   done?

17             THE DEFENDANT:  I'm done.

18             THE COURT:  All right.  Well, this is a difficult

19   sentencing, as many, many are.  This is what retires judges,

20   because they don't want to be here on days like this when cases

21   like this come up.

22             You have turned your life around, there is no

23   question.  You are a fine young man today.  You are well on

24   your way to becoming a wonderful member of our community.  And

25   I am absolutely confident, as everyone here, either both from

26

1    the Government and from your support and of your family, is

2    assured.  And if that was my only duty, you know, and I was to

3    sentence you based on your conduct after you got caught, then

4    this would be an easy decision, but it's not.  And I have to

5    consider the offense, the harm that you caused others through

6    your actions, the need to deter others from being involved in

7    similar offenses.

8              The offense is, I mean, remarkably sinister.  The

9    group that you got yourself tied in with and the acts that were

10   committed are really astonishing.  I mean, much of it occurred

11   when you were 16 and 17 years old.  The Government has

12   indicated that, correctly, that you shouldn't be held culpable

13   for any of those activities, but I can't not consider the fact

14   that it continued for almost three years.

15             And you went to the great lengths that we just talked

16   about to make sure your product was successful on behalf of

17   these hackers.  I mean, 3,000 sales.  16,000 innocent people's

18   lives have been affected.  Some I'm sure dramatically.  Others

19   hopefully not as dramatically.  The four million key log

20   reports, that's not something that I can ignore.

21             And that you stopped when you got caught.  And again,

22   that's something that I need -- is important to consider.

23             So a sentence of incarceration is entirely

24   appropriate.  The Government's recommendation is entirely

25   reasonable given the qualifier that you have cooperated, and a

27

1    5K1 has been filed on your behalf.  That motion I grant.  And I

2    think the reduction that the Government sought, again, is

3    reasonable.

4          I also believe that your counsel is correct that the

5    departure for your age is appropriate.  And it's in large

6    amount considered in the papers of the parties, and in the

7    recommendation, and in the sentencing recommendation, and in

8    the qualification of the harm that you caused, but I think that

9    it should be considered further in the ultimate sentence.

10         I also think that your health is a concern.  I am

11   concerned about the periodic six-month checkups that should be

12   performed by the professional family doctor who has been

13   successful in curing you, and that there should not be an

14   interruption of that service.

15         I am going to sentence you to six months of

16   incarceration.

17         Two years of supervised release.  During that

18   supervised release, you will be on six months of home

19   confinement with electronic monitoring to be paid by you under

20   the direction of the Probation Office.

21         As other special conditions, I will order that you

22   undergo substance abuse testing and treatment as deemed

23   necessary by the Probation Office.

24         That if the Probation Office deems it appropriate,

25   that you agree to computer monitoring both at work and at home.

28

1  I don't believe it is necessary presently, but if it becomes an

2  issue, then it will be directed under the Probation Office.

3        That you allow the Probation Office to maintain

4  knowledge of all your finances and approve your obtaining

5  credit in the future.

6        There is a $100 special assessment.

7        I am going to impose a fine of $30,000, which will be

8  due and owing within the first year of your probation under the

9  direction -- paid under the direction of the Probation Office.

10        I believe that there is a forfeiture order that has

11  been agreed upon in the amount of $69,000.

12        I will allow you to voluntarily surrender after June

13  1 under the direction of the Probation Office.

14        I will ask the Bureau of Prisons to send you to a

15  minimum security facility.

16        Mr. Hill, if you want some input into where you want

17  me to recommend, I am happy to make any recommendation that you

18  seek.

19        MR. HILL:  We will, Your Honor.  We have time, I

20  assume, to get you that recommendation?

21        THE COURT:  Yes.  I will direct in the sentencing

22  order that it be a minimum security facility.  And then we'll

23  work with the Probation Office to get a suitable facility.

24        All right.  Anything else this morning in this case?

25        MR. DWYER:  Your Honor, there is a forfeiture order I

29

1    provided to defense counsel.

2            MR. HILL:  We have it, Your Honor.  And just so that

3    the record is clear, I think the amount is 61, not 69.

4            THE COURT:  61, all right.

5            All right, Mr. Shames, you have a great family and

6    terrific support.  And I don't have any doubt I will never see

7    you again in this courtroom.  And you are a resilient young man

8    as well, and I hope that the future holds wonderful things for

9    you, sir.

10           THE DEFENDANT:  Thank you, Your Honor.

11           THE COURT:  All right.  We're in recess.

12    -------------------------------------------------

                          HEARING CONCLUDED

13

14

15

16

17

18

19

20           I certify that the foregoing is a true and

21      accurate transcription of my stenographic notes.

22

23
                        /s/  Norman B. Linnell
24                 Norman B. Linnell, RPR, CM, VCE, FCRR

25